Mr. Chief Justice, and may it please the Court, states have long assigned students to sports teams by sex. West Virginia is no different. Maintaining separate boys and girls sports teams ensures that girls can safely and fairly compete in school sports. The question today is whether this enduring structure can continue. It can. Title IX permits sex-separated teams. It does so because biological sex matters in athletics in ways both obvious and undeniable. The text, history, context, and structure of the statute, alongside regulations expressly authorizing what West Virginia has done, confirm as much. Respondent says that West Virginia schools can no longer designate teams by looking to biological sex. Instead, schools must place students on sports teams based on their self-identified gender. But that idea turns Title IX, a law Congress passed to protect educational opportunities for girls, into a law that actually denies those opportunities for girls. The Court should not embrace that backwards logic. Aside from its problems with Title IX, the decision below constitutionalizes one side's view of a hotly disputed issue. But West Virginia's law does not offend the Equal Protection Clause either. The West Virginia legislature reasonably and rationally defines sex based on biology and acknowledges the physical differences that biology creates. Given those differences, the law satisfies rational basis review. And the state's law satisfies even intermediate scrutiny because it is substantially related to the important governmental interest in ensuring fairness and safety in girls' sports. Respondent attacks the law by searching for a transgender classification that simply isn't there. The law is indifferent to gender identity because sports are indifferent to gender identity. Ultimately, West Virginia's law, like the laws of at least 26 other states, simply preserves the enduring structure on which girls' sports depends. It should be upheld. I welcome the Court's questions. What's your view of what Title IX, how it defined the separated sexes, male and female? So under Title IX, Your Honor, we would look to the ordinary understanding of sex at the time that Title IX was passed, 1972, and I think also relevant would be 1974 when the Javits Amendment was passed. And at that time, the ordinary understanding of sex was biological sex, consistent with the understanding of sex reflected in West Virginia's statute. I think that's also consistent, frankly, with this Court's own understanding of sex and some of its own cases, like Frontiero, where it likewise focused on things like reproductive function. With that definition, how would you square this challenge with the existence of, continued existence of Title IX? So I think this challenge fails under Title IX. In fact, it amounts to a backdoor attack on Title IX in the sense that Title IX itself contemplates sex distinctions and express regulations specifically applying to the context of athletics expressly contemplate the distinctions between sex of male and female sports teams. In interpreting this definition, would it make a difference or does it make a difference that this is a spending clause statute? I think it absolutely does, Your Honor. Obviously, in the spending clause context that this Court has somewhat recently reminded lower courts, it's important for Congress to speak with an even clearer voice because of the contractual nature of the conditions that are imposed. States like West Virginia have to understand exactly the obligations that they're assuming in the context of a spending clause analysis. And so it amounts to effectively a canon of construction that requires that clear statement in order for the condition to attach. I would have thought that's an interesting argument that this is spending clause legislation in Title IX and Congress has to speak with a particularly clear voice and whatever it's said here isn't clear enough. You didn't raise that argument. And there's an argument from your friend on the other side that you waived the argument or forfeited it at least. And it sure isn't the lead argument in your brief. Help me out. Why? So we, of course, start with the plain text of the statute, Your Honor, that this Court has told us to do several times. Yeah, well, you know, I might start with the constitutional authority under which that statute was adopted, counsel. I think that's equally compelling authority for our understanding. Equally compelling? Constitutionally equal? Perhaps greater compelling authority. I would have thought, yeah. West Virginia, as you know, I think... Why isn't it in your brief? West Virginia is maybe uniquely a fan of clear statement rules, as Your Honor might know from past cases. But in the spending clause context, I think it is, in fact, the case that your Court has repeatedly stressed, that Congress has to speak with that... I know what we've said. I'm wondering about what you didn't say. So I think if you're looking at the way that West Virginia has characterized it, certainly we have made that argument and presented that argument to this Court. I'd refer you to the topside brief. It's clear and centered under a clear heading. I think what their suggestion is from the other side is that we didn't clearly enough that argument below. We would take issue with that characterization. There was obviously binding contrary authority in the Fourth Circuit. And so I think strategically, we decided not to make that the front and center argument because we understood that was dead on arrival in that particular court. But that's not to say that we waived the issue by any means. It's a canon of construction that continues to assist this Court in its application of the text of the statute. Counsel, can I just ask you about this, though? Have we ever applied the spending clause's notice requirement outside of the damages context? Because here, we're not talking about a situation in which BPG is seeking damages, and I thought that was sort of a crux of the spending clause analysis. I will concede, Your Honor, that many of the cases that talk about this rise in the context of it, or maybe even all of the cases rise in the context of it. All of them. Yes. Thank you. I'll concede as much. Yes, Your Honor. But I don't think the Court has ever suggested that the specific request for damages is the reason for its analysis. And I think that actually would be inconsistent. But we would be having to address that, I guess, and extend it in this context if we were to take a spending clause tack. I would respectfully disagree, Your Honor. I would say that just because the Court hasn't done so before doesn't mean it's an extension, per se. I think that what the Court has said is that you view the language of these statutes as effectively contractual agreements. And I think that that same sort of contractual logic applies whether you're asking the State to pay out damages or whether you're asking it to take specific action under compulsion  of that. So who is the contract between here? And I thought the regulated party needs to know what it's agreeing to so it can consent. But here, the regulated party is the schools, and it's the State that's coming in. So I'm just trying to understand how the spending clause analysis works in this context. So I think the State is certainly one party that does receive federal educational funds, but it's also the many other petitioners that stand before you, including the County School Board and the State School Board are also petitioners in this case. I think there would certainly be, if anybody were clearly bound by the conditions of Title IX. So it would map on, I mean, I guess I'm worried that this might actually implicate the question that we didn't resolve in MOYL, and so we'd have to kind of figure that out because it seems like it's a different set of facts than the typical spending clause application. I think, if anything, Your Honor, this is maybe easier than your typical spending clause analysis because you've got everybody from the State all the way down to the local County School Board. Anybody and everybody who's involved in this case is a party to this action. In fact, you resolved a petition for cert from the Athletics Commission saying we're not actually a State actor, and the Fourth Circuit saw things quite differently. So I think there's really no concern in this case that you have an absent actor problem when it comes to the spending clause analysis. And ultimately, of course, if it's just a candidate of construction, if you're looking for a clear statement, then I think it would apply regardless of the particular party who might be in front of you because the statute applies across the board. You know, the regulated party is going to be affected regardless of whether they happen to be in front of you in the given case. I presume that if it's statutory construction, a canon of statutory construction, it's hard to say you can waive that? It's very hard to say you can waive that, Your Honor. Yes. I just wanted to ask if, on your understanding of Title IX, you could have separated bisexual classrooms in biology or in math based on some evidence that you have that say men are better at math and science. What are the limits to your Title IX theory? So I think your instinct there, in part, arises from the fact that we're skeptical of any notion that there are inherent differences. So I want to kind of acknowledge the real reality of the situation. Well, your whole position in this case depends on there being inherent differences, right? It does. And I think that that's exactly why discrimination in the Title IX context, where it acknowledges merely inherent biological differences, that that's not discrimination, that's a distinction. And I think that's consistent with this Court's longstanding understanding of what discrimination means. It looks to differential treatment of similarly situated individuals. So even in a case like North Haven, you're talking about differential treatment of similarly situated individuals. So if we're talking about in an athletic context, you're not addressing similarly situated individuals. And I think, again, the Javits Amendment and the regulations that flowed from the Javits Amendment are a realistic reflection of those meaningful biological differences. So the Javits Amendment gives you a reason in the sports context not to do it. I'm just wondering whether, you know, your friends on the other side have basically conceded that Title IX allows sex-separated sports teams. So I don't know that we need to really get into that. I'd be a little bit concerned about what the ramifications of that might be. And the Javits Amendment in the context of sports makes a difference anyway. But more broadly, I mean, if a state produced some studies saying, listen, you know, women's presence in calculus is holding men back because they're so much more capable and they can just move so much more quickly, it seems to me like there'd be some risk on your understanding that that would be okay. I think, again, realistically, Your Honor, that would almost certainly fail on the... What about a chess club? A chess distinction, I think, again, might fail because there's an actual lack of evidence of meaningful physiological differences that are reflected in the existence of the express regulations in the athletics context. I mean, I think a lot of people would say, you know, if you look at the ranks of chess grandmasters, there are not a whole lot of women there. And, you know, what does that mean? Well, you know, I think that there's a sort of intuitive... I think there are a lot of chess grandmasters who would tell you that women just like, for whatever reason, they're, you know, they're not as good as this. I think chess is an interestingly closer question. I've come to understand just recently, in fact, that there are sex distinctions in the elite leagues. You're putting the hypothetical, and I guess the question really is, okay, Title IX says you can't discriminate on the basis of sex. Yes, Your Honor. I can understand what that means. I think I do, right? You can't treat men and women differently. Okay, all right, fine. You're saying, ah, but it matters whether they're similarly situated, and your friends in the government like that line, too. Well, there's, you know, I've got a lot of evidence that girls perform a lot better in high school than boys. Okay, there's a lot of scientific evidence. Oh, whatever, all right, just posit that, all right? Well, so I'm going to have a special remedial program for boys, and the women can't come, because they're not similarly situated. Why on earth would Title IX care about that? It says you can't discriminate on the basis of sex in a program or activity of your educational institution. So I think... Why put that gloss on it? And, Your Honor, I want to be clear. I think the task for the court today is somewhat easier in part because of the express regulations that they have actually not challenged and that do expressly contemplate exactly what West Virginia has done. So I think your hypothetical yes, of course, is there, but I think the reality is that Congress and the agency have together kind of addressed this specific question in a way that makes this court's task much easier. But I think the problem may be with your... Maybe another answer. We don't need to rely on the similarly situated argument. Is that what you're trying to tell me, counsel? I think you could also take that approach, yes, Your Honor. And I think the reality is that that hypothetical addresses a situation that's much closer to the sort of exclusion and the specific context that gave rise to Title IX in the first place. And so I think that the court would be much more legitimately concerned that that would detect the very problem that Congress is trying to head off in passing Title IX in the first place. But I think that really kind of puts the lie to the position that West Virginia is somehow discriminating because it's advancing the very same purpose that Congress itself was trying to advance in enacting Title IX in the first place. I mean, that's why West Virginia somewhat deliberately made its law mirror the exact same language from the express regulations themselves. I'm afraid I've got one more question. Oh, I'm sorry. Please go ahead. I can do both. No, you can't do both. That's not fair. I mean, even by our standards. You make the argument that on the basis of means solely because of, solely. We have long said that because of means but for, not solely because of. The Rehab Act speaks of solely because of. It seems to me an awful big stretch, counsel, to say that on the basis of imports anything other than but for causation. And Comcast is against you there. And I just wonder why you put your eggs in that basket. So three answers, Your Honor. And by the way, isn't the distinction here solely because of sex anyway? Well, let me take each of those in turn here. I'll try. I don't think that the case turns on the court accepting the idea that it's solely on the basis of sex. I think you could stop. That's a sufficient answer. Fair enough. Thank you. Your turn. Thank you. Can you explain the relevance and significance of the Javits Amendment to distinguishing sports from all these other hypotheticals? So I think the relevance and significance is, Your Honors, are faced with a unique set of regulations in that Congress was directly and intimately involved in both the instigation of the regulation in 1974 and then sort of— And in that law referred to the nature of particular sports, right? It did. So what they said was, we want you, the agency, Hugh, to go ahead and implement Title IX writ large. And they called out one specific problem that I think arose on the floor about whether Title IX applies to intercollegiate athletics, in particular intercollegiate athletics. And I would say— And that's been extended to high school. Right. By the regulations. Exactly. But ruling for you on sports does not open the door, in my view, given the Javits Amendment to the chess club necessarily. That could be separately analyzed, but it doesn't follow from a law that says sports. That's exactly right. And that's exactly why we were trying to make your job easier in the sense that we took the language expressly from the regulations and mapped it over under our own statute. So there's really no debate. If it's outside the context of Title IX, it's outside the context of our statute. So at that point, the Court's analysis is done. But I think when you have a regulatory scheme where Congress was specifically involved, you know, in fact, undertook a review, then that's exactly the sort of regulation that even in a post-Loverbright world continues to have importance because it's longstanding, continuous, contemporaneously issued. All those sorts of checkboxes that this Court, under a Skidmore framework, continues to place substantial weight on. So I think that makes the Court's task relatively straightforward. And what about Bostock? No, no. Do you want to deal with Bostock? I think, so I guess it depends on the way in which you mean it. Does it deal with Bostock? Well, if an employer said we're going to fire all the transgender women, that'd be a violation. If a school says we're not going to allow the transgender women to play sports, you say that's not a violation. Both statutes use the term sex. Can you explain? I think the reason why is, well, to be clear, our statute is very different from a specific choice to say a transgender person shall not participate because of their transgender status. And I think that really is what makes the difference between this case and Bostock, is Bostock is attacking status-based discrimination. And West Virginia would, I think, be in a much different position if we had just said transgender persons shall not compete. But that's not what West Virginia... What if it said transgender women and girls shall not compete in women's and girls' sports? I think, again, that's a much closer question. I think if we're talking about engaging with the actual status... You think you could lose under Title IX with a statute that said that? I think, Bostock, I think is, now I understand Your Honor's question. I think Bostock raises an interesting question as to whether that reference to transgender status would in turn implicate the sex status that Title IX is meant to address. But ultimately, I think the court doesn't need to address that because you can stop at the first step, right? You don't have an actual transgender exclusion that would give rise to that kind of linkage of analysis. Thank you, Counsel. In terms of Bostock, I understand not to say that discrimination on the basis of transgender status is discrimination on the basis of sex. But the question here is whether or not a sex-based classification is necessarily a transgender classification. And I wonder if that is consistent with your understanding. It's entirely consistent. I would say on the equal protection side, in particular, and also in the Title IX context, I think for some of the reasons I just discussed with Justice Kavanaugh, I think the court can stop and say that a sex definition and a reference to biological sex is not the same as a transgender classification. And I think even if we engage in the sort of but-for causation analysis, I think it's as simple as saying, does the result change if you change the gender identity of the individual involved? And the reality is if you apply the West Virginia statute to someone identifying as a biological boy identifying as a boy applies in the very same way as a biological boy identifying as a girl. Justice Thomas? Justice Oliva? Justice Sotomayor? I find it strange that the district court and the court below did find a Title IX violation but not an equal protection violation and remanded for the equal protection violation. I'm not sure how it could do that because it would seem to me that if the evidence is not sufficient to justify finding an equal protection violation, it's not sufficient to find a Title IX violation. Is that correct? At least on the record as it exists now. Right. And so to be clear, the district court actually ruled for West Virginia on both Title IX. Right. And so the Fourth Circuit said you lose on Title IX and we're not sure about equal protection. But assume the Fourth Circuit is right. Right. Well, so in answer to your question, I think that doesn't make sense. And I think the reason why it doesn't make sense is because the Fourth Circuit effectively stripped out what they said is Title IX doesn't leave room for any kind of justification or any kind of analysis of what the reasons might have been for the state's action. And I think respectfully, particularly when you look at, again, the regulations themselves, it actually does contemplate exactly that sort of analysis. I agree with you on the regulations. Right. And so could you not have a Title IX violation but still have? Let's assume, and I know you're going to fight the factual premise. I'll try to embrace it, Your Honor. All right, embrace it. All the scientific evidence shows that there's no difference between cisgender girls and trans girls. I know there's a fight about that. It hurts. But assume it. Could you not still have violated? Could we hold that as the regulation stands, the regulation would permit you to discriminate, but the equal protection clause would not? So let me try to get my head in the framework of assuming. Assume. I think the regulation would still allow us under its expression. I'm assuming yes. And so you're asking, even assuming our compliance with the regulation, could we still have a potential equal protection problem? Yes. In that world, I think we would still be fine under the equal protection analysis, frankly, for some of the reasons that you heard from the solicitor earlier today, where it's because the, even if you assume the heightened level of scrutiny, let's assume that we're in intermediate scrutiny world, it's still a reasonable fit. It's still, it's not a perfect fit. Then we're back to that. Exactly. And I know we've had a long colloquy about that today, but ultimately I think that's what I am. I just destroyed that by saying that the science has said there's no difference. And we know that's not true. Assuming the science said there was no difference, how could you ever say it's reasonable? So I'm assuming a world in which there's no difference between, so you're saying testosterone suppressed individuals? Is that? No, I'm saying... Or you're saying all men and women full stop?  Oh, okay. I apologize for misunderstanding the hypo. If we're assuming a world in which there's really no biological difference, full stop, as to men and women, full stop, then I think, right, the legitimate governmental interest falls away. I agree with you. Mrs. Kagan? Mrs. Kavanaugh? There are, as we've discussed, a bunch of states that allow biological males who identify as female, transgender, women and girls, to play women and girls sports. We were talking about that with the Solicitor General earlier. On your theory of Title IX, are those states violating Title IX rights of the biological females? I think it's a much closer question under Title IX than it is under equal protection. And I think the reason being is that the regulations specifically say there's... Well, what do you think the answer is under equal protection? I might as well ask that. So under equal protection, I think we agree with our friends in Idaho that there's enough room for California to make a different determination. I think under Title IX, the reason why it's a closer question is because of the existence of the regs. And the regs start by saying you have... You start with co-ed teams, and then you can move down to sex-separated teams in the context of contact and competitive skill. And it really contemplates a real genuine sex distinction in that move-down be provision. And then, of course, it pivots... It also has the catch-all where it says, but actually in the context sports, you can't move back in the co-ed world. So I think if a state is moving away from a genuine sex distinction as the regulator contemplated and as Congress ultimately contemplated, then maybe they're kind of... If you think of B as a safe harbor, in a sense, they're outside the scope of that safe harbor, and now they're running into the problem in A. So I don't think the court needs to get into any of that. Right. I agree. I'm just trying to know what's coming. But I think that is... It's a closer question, at least, than the... Because your theory is that sex is biological sex in Title IX, or is that not your theory? No, that is... And it's not our theory, Your Honor. It's just the simple... It's the ordinary understanding of what sex meant, both in 72 and 74, when the regulations were themselves implemented. We're just trying to be cognizant of that. Thank you. Thank you. Justice Jackson? So I guess I'm trying to puzzle through whether or not there is some independent form of discrimination against transgender women that is distinct from the sex separation that Title IX allows. So I appreciate that your argument is that because the regulations permit sex separation and that hasn't been challenged, that that should be the end of this inquiry, basically. And I think you get there because you say you're sort of picking up on this idea that maybe this is just about a definition of who is a male or a woman. Is that right? I think to some degree, but it's also, Your Honor, it's just because we're indifferent to a person's gender identity in applying the law. But the law actually operates differently, I think, for cisgender women and transgender women. That is, with respect to their desire to play on a team that matches their gender identity, cisgender women can do it. Transgender women cannot. And so we do appreciate a distinction, I think, that is being drawn on the basis of your gender status, gender identity status, trans or cis, right? So and I want to make sure I understand if we're operating in Title IX world or Equal Protection world, because I think it might make a difference to the answer, but. Okay. Title, let's start with Title IX. So Title IX, I think the question of, I look at this statute and see a distinction between boy and girl, indifferent to gender identity. And I think that. Right, but I'm testing that proposition, right? You see that distinction and I see it too on the separation of teams level at the beginning. Right, and I think what I'm hearing is that that distinction arises from a difference in effect. And I don't see a disparate impact analysis that's sort of hidden away in Title IX. But why is that a difference in effect? So it's like a second order discrimination, right? The first order is separating male from female. Right. The second order is separating transgender women from cisgender women, right? Respectfully, I would disagree. Yeah. The reason why is just because I think any time you have a classification, you could divide it into subclassifications. And I don't think that then becomes, like the law in the same way applies to brown haired biological girls and blond haired biological girls. I understand, but I don't think you can get. I'm not sure, and maybe this is switching to the equal protection. I don't even get out of the implications of making a classification by setting it up as a definition, you know, as a subclass. And so we've already okayed the classification because it's really all about classification. You can't distinguish in that way, right? Well, I think what the court said on the equal protection side is you look at the facial classification, and I think here it's effectively unconceded that the facial classification is between boy and girl. And I think at that point, maybe you have a situation where you think that the classification is somehow a proxy for some sort of secret secondary classification, but I don't... No, but the definition implicates another division. So here's an example. So suppose that we have Title IX exempting, and I think it does this, certain religious institutions from its requirements. And let's say Title IX defined, then went on to define, this is to include only those institutions that proselytize. I mean, is that a classification problem or a definition problem? I would say it would be a classification problem, and you'd still have to apply all of the heightened scrutiny just because, you know, they're defining religious institutions in a certain way. Similarly here, you have the overarching classification, you know, everybody has to be... play on the team that is the same as their sex at birth. But then you have a gender identity definition that is operating within that, meaning... a distinction, meaning that for cisgender girls, they can play consistent with their gender identity. For transgender girls, they can't. So I think that... okay. As to the part about your ability to pass over from boy to girl... Yes. You can go from one way but not the other. I want to be clear that BBJ is not challenging that specific classification. I think that's important to start with. But I think, if anything, that's useful evidence as to the lack of a transgender-based discrimination, because if the legislature were just sort of unsettled by the notion of transgender athletes, I think the answer would have been to then bar them from... No, I appreciate that. I appreciate that. I guess I was getting at the... what I understood the Chief Justice to be trying to discuss, which was this notion that this is really just about the definition of who... we accept that you can separate boys and girls, and we are now looking at the definition of a girl, and we're saying only people who were girl-assigned at birth qualify. And there is authority, cited in our brief, this court I don't think has ever phrased it quite as in the way of this definitional framing that we're talking about right now, but certainly cases like Janna Rock in the Second Circuit do approach it from this sort of definitional framing, and they say that if you effectively concede that there's an initial ability to draw a classification, then that suffices to set aside the intermediate scrutiny question. But then past that, the definitional question is evaluated through rational basis review, and that's Janna Rock. I recognize this court has never gone as far as that, but I don't think the court needs to go as far as that, because, again, I think the way that you would do the analysis is to start by looking to the face of the statute, and if the face of the statute is engaged in a conceded boy-girl sex classification that's conceded to be legitimate, then at that point, you kind of know which world you're operating in. Thank you. Thank you. Thank you, Counsel. Mr. Rufan? Mr. Chief Justice, and may it please the Court. So there have been a lot of different arguments made this morning, and so I think it might be helpful to just focus on what I think are the easiest way to resolve both of the claims in this case. On the equal protection claim, it's the arguments we discussed this morning about intermediate scrutiny doesn't work on this as-applied basis. So let me focus for the Title IX claim. I think the simplest way to resolve the Title IX claim in this case is as follows. The regs expressly authorize sex-separated teams. The other side isn't challenging those regs. When those regs use the word sex, they obviously use the word sex to mean biological sex in the reproductive biology sense. That's the ordinary meaning of the term in 1972 and 1974. As a result, whether or not they are right that taking testosterone suppression eliminates any physical advantage doesn't matter, because the regs define separation based on sex, based on biology, not based on circulating testosterone levels. So the difference that—their claim that they've eliminated the difference just doesn't matter under the language of the regs, and that's enough to resolve the case. Your argument, as I understand it, is that they're not similarly situated. So that's an additional argument you could make, is to say that even if you just focus on the language of the statute, the statute says discriminate on the basis of sex. Discrimination, as this Court has repeatedly recognized, including in Bostick, means treating one person worse than someone who is similarly situated. And yes, we don't think a man taking performance-altering drugs is similarly situated to a woman, but you don't even have to reach that question, because under the regs, the question is, the regs say you could separate based on sex. Everyone agrees that sex in those regs means biological sex. Therefore, the circulating testosterone levels are just legally irrelevant under the regs. So why do you say you can separate the sexes? Why are you now taking the position in other cases that if states choose not to separate the sexes in the way you want, that they're violating Title IX? Well, so again, we think that's a separate question, and you should leave it separate. But the argument we're making in those cases is the statute and the regs allow separation based on sex because of the biological differences between men and women. If you purport to separate based on biological sex, but then you allow some biological males to play on the female team, you've undermined the justification for separating in the first place. So why? Because normally, you can't separate. If you take, for example, world history class, you can't have world history class for men and women. That's generally prohibited by the statute. The reason you could separate for sex, for sports, is the biological difference. And if you then undermine that, you undermine the justification for separation. So we're now back always to the science. Is there really a difference, and a difference for this kind of person? If it's not clear the way you want it to be in terms of separating the sexes, I'm wondering why it's clear for your attempt to force those states who are choosing not to do this. You're now saying you must. Again, that question is not presented in this case, and for this case, the factual dispute is irrelevant. Mr. Moopin, do you think that the spending clause should inform our analysis here? I don't think this Court should invoke the spending clause in this case. Why not? For two reasons. One, we think that the statute and the regs clearly do not permit the claim. I understand that. And then the second is how the spending clause applies in the context of Title IX is, I think, a little more complicated than my friend suggested. It's not a clear statement requirement. I think if you look at some of these clear notice cases, cases like Jackson and Geiser, I don't think you would say that those statutes had a clear statement. It's a clear notice requirement. Right, but how that applies is a little tricky, and I think in the case— Why? I mean, your argument is that in 1974 and 1960, sex meant biology, and it's not clearly—there's not clear notice otherwise. Why isn't that the end of it? So I think the end of it is the statute clearly doesn't permit this claim. I'm just saying that I would be cautious about speaking about how the clear notice requirement applies, because it is not a clear statement requirement. I understand that. You're not answering my question. How— It's a clear notice requirement, at minimum, and a voluntary agreement, and sex at the time of the statute meant, as Bostock said, you know, there's a good argument, it's biology, and why wouldn't West Virginia be within its rights to say we didn't have clear notice otherwise? The scope of the clear notice requirement is a tricky question. If you look at this Court's cases, I suspect— What's tricky about that? I suspect Your Honor would think a lot of the cases where this Court has found Title IX to apply, you would think there's not clear notice. All right. And so I think it's a tricky issue, and I think it's a case that should be briefed, and I don't think it's an issue you need to solve. Okay, and then on the statute itself, it speaks of discrimination in program or activity, and in Davis we explained that that requires kind of a look at the whole of the institution, because the definition of program activity is the whole institution. And so that's less individual-focused, it seems to me. Thoughts? Well, I think that's true for the funding, but I don't think that's true in terms of how the discrimination provision works. If you discriminate or exclude in one part of the school, I don't think you could justify that by saying, well, all the rest of the school, we treat everyone fairly. I think those cases you're talking about, as long as you're receiving funding somewhere, the whole school's activities are covered. Okay. And so it really boils down to the living accommodations provision, which Congress anticipated there would be sex-separated living accommodations being permissible, the Javits Amendment, and then the regulations that are longstanding and then, therefore, are entitled to some serious consideration. Well, no. So, you know, Your Honor asked why we run the similarly situated argument. Take, for example — No, don't bring that back up. Well, locker rooms and showers aren't covered by any of the things you just identified. Not the living facilities provision, not the Javits Amendment. None of those things covered locker rooms and showers. So unless you use a similarly situated requirement, you would have to say that Title IX bans single-sex locker rooms and showers. Okay. All right. If that's your view, then let's talk about the similarly situated. I guess I have to. What about the hypothetical I posed earlier that when it comes to high school performance, girls are sure a lot better than boys, and so we're only going to have remedial classes for boys, and girls aren't free to attend? So I don't think those differences are based on inherent biological differences. Well, let's say I've got really good science. I mean, it's all about the science, right? I've got the science. You're fighting the hypothetical. I'm not fighting the hypothetical, Your Honor. I think what I would say, Your Honor, is that this Court has held in cases like VMI that, in general, classification based on sex is impermissible because, in general, men and women are similarly situated. Where that's not true is for the sorts of real, enduring, obvious differences that this Court talked about in cases like VMI, the differences in reproductive biology. I don't think the sort of pseudoscience you're suggesting has been based on that. Well, it's not pseudo. It's good science. It's not pseudoscience to say boys' brain development happens at a different stage than girls' does. Well, with all respect, I don't think there's any science anywhere that has suggested that these sort of intellectual differences are traceable to biological differences, and I don't think the statute should be read to cover that. Well, with respect, I don't think you're a Ph.D. in this stuff, and I know I'm not, but I'm asking you to deal with the hypothetical. And so I guess what I would say about that, Your Honor, is, I mean, the statute says there's no discrimination on the basis of sex. And you're saying, eh, it's okay when they're not similarly situated. And I'm giving you, you're worried about locker rooms. Great. I appreciate that. But I'm worried about that math remedial class or the chess club or whatever. Right. And so, look, let me put it this way. The general rule is you have to treat men and women the same. I would have thought that's what the statute said. And I think you have to be very careful about recognizing the exception. And so when you recognize an exception for what's similarly situated, I think you should tether it to the sorts of long-recognized differences that would have been recognized at the time the statute was enacted. At the time the statute was enacted, no one would have doubted that it said, it didn't require having them. Oh, I think at the time the statute was enacted, 1964, there were a lot of people who thought boys are better at certain things than girls at others. Not based on. That we don't believe anymore. Not based on inherent biological differences. I think that maybe in 1964 they did. And if they did, they didn't have any basis for it. Whereas, for my part. I'm giving you a hypothetical where I have the science to prove it. And you're saying it's still not good enough. I guess if you're asking me a hypothetical where the science existed in 1972 and everyone agreed with it, then it might be a different inquiry. That really is a hypothetical because there wasn't. Do we have to, I mean, I think these are very, very hard questions. I started with the math question before. But do we have to, because of the Javits Amendment, because the other side has conceded that Title IX permits sex-separated sports, can we avoid your whole similarly situated argument that you run? Because I don't really like it that much either. Absolutely. That's why when I stood up here, the first thing I said was the easiest way out of this case on this claim is to say that the regs permit sex separation. They don't dispute that. Save locker rooms and all that. Right. The only reason I went into it is I was nervous that any sort of suggestion that there isn't a similarly situated requirement could lead to results that I don't think the court would actually stand up to, like locker rooms and showers. And so I think I have no problem if the court doesn't take it for the shot. Okay, and I'll say, I mean, I said I don't like the argument. At first blush, I don't like it. I'm not trying to prejudice anyone making that argument later. But, I mean, I think it opens a huge can of worms that maybe we don't need to get into here because the Javits Amendment and the concession. That's right. As long as you don't cut it off the other way, I think that's perfectly fine. Thank you, Counsel. Justice Thomas. Justice Sotomayor. Justice Kagan. Mr. Muglan, you talked about you are litigating this case the opposite way among states that do not prohibit trans women and girls from participating in sports teams. Is that correct? Yes. So, and you said, and I appreciate this, that we should not address that question. Are there arguments that do suggest what the answer is on that question that we should be careful about? Or do you think that they're really self-contained boxes? I think they're generally distinct. And what I could confidently say is the argument that I identified at the outset and with Justice Barrett just now, if you just say that the regs mean sex, sex doesn't mean circulating testosterone, and therefore you're not required to allow boys to play on girls' team regardless of the circulating testosterone level, that argument would not influence the outcome of those other cases one way or the other. Are there any arguments that would influence the outcome one way or the other? I don't think so. Maybe if you engage in discussion about what the regs meant with respect to things like equal opportunity, that might be the sort of issue where it might have implications for the other case. Thank you. Justice Gorsuch? I just want to be crystal clear about that. If we say sex in Title IX is biological sex, and then we get to the next case, the California case or whatever it is, how would California still prevail if we've said that here? I think the argument the other side would make would be that the regs don't prohibit them from accommodating transgender individuals. Even though the regs permit separation based on sex, they also don't forbid accommodation of transgender individuals, the argument they would make. And they would say it doesn't matter that you're allowing some boys who have a biological advantage to play on the girls' team. What's the argument you're currently making in opposition to that? That the justification for separating on the basis of sex is the biological difference, and so you're undermining the justification for the separation. Right, and so we start with the separation. I think what you're saying is once you separate boys and girls' teams, which everyone does, and it may be even required in my view, to have equal girls' teams, then California really doesn't have an argument if we say that sex in Title IX means biological sex, which may be okay. I just want to make sure I know what we're doing. Well, Your Honor, obviously we don't think they can argue that, but I'm confident that California would stand up here and say that even if you ruled the way I just urged, they should be able to argue the opposite by saying essentially that they're allowed to accommodate on the basis of gender identity, even though the regs mean sex and sex means biological sex. That's the argument they would make. Whether that argument's right or wrong is for another case, but I don't think if you adopt the argument I'm making here today, their hands are going to be tied. Okay. And then on this premise that has been conceded, I just want to make sure I understand your view. My understanding is that it's sex-separated sports teams, so long as they're equal opportunity for girls and boys, are perfectly constitutionally permissible. Is that not your understanding? Yes. Yeah. Per the arguments in both cases. I mean, it's conceded, but it's conceded because it's obvious. Right, because there are obvious biological differences between men and women, and that's why... Well, the why, people may debate, but it's obvious. And so, too, Title IX, because of the Javits Amendment, at least, even if not Title IX originally... Well, I would say even without the Javits Amendment, because importantly, the Javits Amendment is only for teacher collegiate. And it's been interpreted in the regs, so to go to high school and no one's ever challenged that part, that's the part, okay. But that also, sex-separated sports teams, are perfectly permissible under Title IX, at least with the Javits Amendment, and probably without, correct? That's right. And that's conceded, but that's, you know, it's conceded again because everyone accepts that, has accepted that for a long time, so long as the opportunities for boys and girls, men and women, are equal. That's right. And I think what the other side in this case is trying to do is say, yeah, that's fine, but they're being excluded. And the problem with that is they're not being excluded from participating on the boys' team. They're choosing not to participate on the boys' team. Now, for understandable reasons, given their gender identity, but the state is not excluding them from the boys' team. And, Justice Sotomayor, this explains the confusion in the Fort Serkis opinion, because I agree with you. It is very strange that the Fort Serkis... Sorry, we've got to go back. Sorry. Well, finish that up. Sorry. The reason why the Fort Serkis found that there was a viable Title IX claim, even though they said that there was a factual dispute, is because they bought into this notion that because the transgender boy doesn't want to play on the girls' team... Sorry, doesn't want to play on the boys' team and can't play on the girls' team, they're excluded. That's true even if they have a physical advantage. And so the court said, we don't care about the physical advantage. It's still a Title IX violation. And that's clearly wrong. That's a misinterpretation of the statute. And the error in it is that they're not being excluded from the boys' team. They're choosing not to participate on the boys' team. Sorry, one more. Bostock does not control here because... fill in the blank. Because the law doesn't classify on the basis of transgender status. It's classified on the basis of sex, biological sex. Just like in Scrimeti, the law there classified on the basis of age and medical treatment, here the law classifies on the basis of biological sex. The person's gender identity is wholly irrelevant to how the law applies. Thank you. Justice Barrett? Justice Jackson? But they are being prevented from playing on the team that matches their gender identity, correct? That's the effect. So let me use your example from earlier. You said there's a cisgender woman. She could play on the team she wants. There's a boy who identifies as girl. He can't play on the team he wants. Take that same boy and switch his gender identity, but say he still wanted to play on the girls' team. Say he was a very unathletic boy. He likewise couldn't play on the team. So it's not the gender identity that's keeping him off the girls' team. It's his biological sex. His gender identity is wholly irrelevant to it. Now, I agree with you. There's a very significant disparate impact on transgender individuals by this law because they're the boys who are most likely to want to play. Have you said that Title IX never covers that kind of disparate impact in terms of its discriminatory effect? Well, it certainly doesn't cover disparate... First of all, I don't think Title IX covers disparate impact, period, because it uses... But in terms of its discriminatory effect, I'm just trying to understand it. Is there something to this notion that differential treatment in effect, in this way, could be something that Title IX cares about? A, I don't think Title IX covers disparate impact even on the basis of sex. It certainly doesn't cover disparate impact on the basis of gender identity. Okay. Thank you, counsel. Mr. Block? Mr. Chief Justice, and may it please the Court, BPJ signed up for school sports because she was an 11-year-old girl starting a new middle school who wanted to meet people, make new friends, and be part of a team. West Virginia argues that to protect these opportunities for cisgender girls, it has to deny them to BPJ. But Title IX and the Equal Protection Clause protect everyone, and if the evidence shows there are no relevant physiological differences between BPJ and other girls, then there's no basis to exclude her. In thinking through the Title IX claim in particular, it's important to distinguish between how Title IX operates as a general matter and how it operates outside the context of athletics. And I'm glad that we're doing that this morning. Instead of focusing on athletics, West Virginia argues more generally that this Court's reasoning in Bostock does not apply to Title IX. To distinguish Title VII from Title IX, West Virginia argues that Title IX protects groups instead of individuals and applies only when sex is the sole cause of adverse treatment. That approach takes a wrecking ball to the text of Title IX and the structure of this Court's anti-discrimination precedents. It would dilute Title IX's protections for everyone, not just transgender students and not just in the context of sports. West Virginia's law treats BPJ differently from other girls on the basis of sex, and it treats her worse in a way that harms her. Outside the context of athletics, that's all BPJ would need to establish a Title IX violation. But the Javits Amendment provides extra breathing room for reasonable regulations that take into account sex-based differences in athletics to provide equal athletic opportunity for everyone. West Virginia's exclusion of BPJ does not fall within that framework. Unlike the exclusion of a cisgender boy, excluding BPJ doesn't advance any interest in ensuring overall fairness and safety. And unlike the case of a cisgender boy, excluding BPJ from the girls' teams excludes her from all athletic opportunity while stigmatizing and separating her from her peers. I welcome the Court's questions. Doesn't your claim ultimately depend on the existence of sex-segregated sports? No, I don't think so, Your Honor. I think this is similar to Morales-Santana, where the claim was an equal protection claim. Well, I mean, let's say there were no Title IX requirements for sex-segregated sports. Well, if there were no Title IX requirement, and I don't think Title IX requires sex-segregated sports. Well, it permits. If there were no Title IX and all the sports were co-ed, then she wouldn't be subjected to disparate treatment on the basis of sex. So I think the claim is the discrimination, and it's perfectly possible to have... So doesn't that suggest that you're a subcategory of the relevant class of female athletes? Isn't that your point? Yes, well, for the equal protection claim... My point is that you're challenging a category that does not exist in the statute, but is dependent upon the existence of a category in the statute that you're not challenging. I wouldn't put it that way. I would put it the way there's a classification that we think is valid as applied to most people, but is invalid as applied to a discrete subset of those people. But I don't think the success of that equal protection claim hinges as an a priori matter on the existence of girls' teams. There are lots of ways to remedy an equal protection violation. But I think, given the way you phrased it, the question becomes a little different, because what it seems to me you have to establish is the basis for requiring an exception to the classification. You're not challenging the idea of having boys and girls in separate sports. You're saying that you cannot exclude transgender girls from the definition of girls. And that's an entirely different question than the equal protection question. I don't think we're arguing for an exception. I think we're bringing exactly the same argument in Caban. In Caban, the plaintiff wasn't saying, this is valid for everyone, but I want an exception from it. In Caban, the plaintiff was saying, this is valid for other fathers, but it's not as valid as applies to me. So I just think it's an as-applied equal protection claim. I understand the court might decide those claims don't exist, but I don't think it's a claim asking for an exception. It's a claim saying it's as-applied to them, it's okay. As-applied to me, it's not. Counsel, how do you get to a Title IX violation? I know exactly how you get to an equal protection violation, okay? If you accept that the regulation does, by its own terms, permit sex-based sports, does permit schools to do this, what in Title IX explicitly, or even logically, says that you have to give transgender... Thank you. ...girls the same opportunity? Because the regulation said, it's not just the statute, it's the regulation said, you can create separate sex teams. Thank you. I take the point. I think there's always been a tension between the underlying text of Title IX, which protects individuals, not groups, and the regulations, which are authorized by the Javits Amendment and have special leeway to make some group-based measurements. But if you look at the rationale for the regulations, Hugh, when it issued the regulations, said that we think that our group-based method, which otherwise would have been completely impermissible for Title IX, adequately protects the rights of individuals. Because if boys and girls, as groups, are being given equal sets of overall opportunity, then every individual in the group also has a set of equal opportunity to choose from. I think that's the problem. You're absolutely right to worry about the wrecking ball, but I think we've kind of taken a wrecking ball to that. There's no solely in the statute. We're talking about individuals. But Javits changed Title IX. And it said, sports are different. And we've got these regulations that have been out there for 50-plus years. And normally Skidmore kind of comes in there. Forget about the spending clause, I guess. But maybe I'll ask you about that, too. Why doesn't that make this case very different than Title VII? So I completely agree. The Javits Amendment is what makes this different from Title VII. And I'm very happy with however this decision comes out, to have a decision that's focused specifically on the unique context of athletics as opposed to these broad arguments about Bostock applying to the general matter. But I guess what I'd say is the regulations still require equal athletic opportunity. It's not a complete exception for sex-separated teams. But Javits says it can be reasonable. Yes. And do you dispute that the hue regulation that's been on the books for 50-plus years is reasonable? I think it is absolutely reasonable as applied to cisgender students. I think that as applied to transgender students, instead of providing them equal overall opportunity, it's a complete exclusion from the program. And so that's our argument, that it's reasonable as applied in the context of cisgender people. But interpreting the regulations to authorize this sort of categorical exclusion that doesn't give DPJ an equal set of opportunities to choose from would be an unreasonable way to implement Title IX. It's unreasonable as to all transgender students. No, I think it's a combination. I think so. A reasonableness test, I think that requires some sort of, excuse me, ends means fit. And I think that that exists when it comes to cisgender students. I think what makes DPJ's case differently from a cisgender student is two things. First, she doesn't have any of the physiological distinctions that justify the sex separation in the first place. And second of all, the harm to her is of a material different kind. It's one thing to say, we're not going to let boys play volleyball because they have all these other sports to choose from. Or we're not going to let girls play football because they have all these other sports to choose from. It's another thing to say, you don't get any sports. But in that argument, does it matter whether DPJ has a competitive advantage or not? Yes, we think it does. And I appreciate the opportunity to clarify that we don't have any objection to vacating the grant of summary judgment in our favor. We did our best to defend the judgment below. But our argument before the Fourth Circuit for summary judgment was that there wasn't a genuine disputed fact about whether she had an advantage. The Fourth Circuit, sua sponte, granted summary judgment to us based on the theory that that fact wasn't material. That's never been our argument in this case. So your argument depends on the, depends on her not having a competitive advantage because she's not been through male puberty. Not just not been through male puberty, but also gone through a female hormonal puberty, all the physiological changes accompanying it. But that the argument goes away if those facts go away. Yes. Yes, absolutely. Which is at the beginning of the argument, Justice Kagan, you talked about this could be resolved based on a legal principle or based on the facts. And I really do want to make a pitch for resolving it based on the facts because look, if they're right about the facts, then we should lose. And the irony is that in order to win summary judgment in this posture, when there's a disputed question of fact below is they can only win in this posture if we're right about the facts and there aren't any advantages. And I, I don't think there's any need at this juncture for this court to issue that broad a holding when according to them, once the evidence comes in below, we're not going to get past summary judgment. You're not suggesting that we decide the factual question. No, no, no. I'm suggesting that the case be allowed to be decided on remand on the factual question, which I think like this is an important issue. It affects, it may affect the whole country and the court wants to get it right. And I don't think the best way to get it right is to rely on, you know, cherry pick studies or assertions in amicus briefs. I think the way to get it right is to let all the facts they're trying to put in the record actually be put in the record. And then we'll have the facts in front of us and maybe they'll make the issue go away. But I think it's unnecessary to, you know, intervene at this instance with a sweeping legal conclusion to something that might actually be a narrow factual dispute. Can you explain whether or why your theory would allow a cisgender boy who just couldn't make the boys team? I mean, he doesn't have an equal opportunity. He can't play. There's no team he can play on. And let's say that his athletic ability can be shown that he has no competitive advantage and he wants to be on the girls team. Why can't he on your team? I appreciate the question. I think, I just want to be clear about what we think the justification for the separate teams is. We don't think the boys team is for better athletes and you have a backup team for athletes that aren't as good. I think the purpose of the teams is to control for the variable of sex-based advantages so that talented women athletes have all the same opportunities as talented male athletes, but also untalented male athletes should be compared to untalented women athletes. So they're not being separated based on how good you are, right? The whole point is to allow female athletes to have all the same opportunities as men by controlling for the sex-based differential that comes through puberty. And so that's why I don't think that the claim is the same there. I think that's what's happened here is by virtue of her medical care, BPJ is already effectively controlled for those sex-based advantages. And so she is completely in the position that she would have been if her birth assigned sex had been female. As opposed to a cisgender boy who's just not very good at sports, and if his birth assigned sex were female, maybe he'd be even worse. I don't know. But again, the purpose is to control for the variable of sex to provide equality, not to have a good team and a team for people that can't cut it. Now, I'm happy to address- Can I ask a question on the law on Title IX? I mean, I hate that a kid who wants to play sports might not be able to play sports. I hate that. But it's kind of a zero-sum game for a lot of teams. And someone who tries out and makes it, who is a transgender girl, will bump from the starting lineup, from playing time, from the team, from the all-league, and those things matter to people big time, will bump someone else. And so one way to resolve that, as you say, is the facts. Try to figure out, is there really a competitive advantage? I think we're going to get a lot of scientific uncertainty about that, a lot of debate about that, a lot of different district courts. The other way on the law, one way on the law is, okay, well, sex in Title IX and in JABBITS meant biological sex, and it's up to Congress to adjust that going forward if they want, given, as you say, and your co-counsel said earlier, people are learning more about this, and maybe there really is no advantage. Well, if that's true, and some states are operating under that basis, that's the way to go. But for now, at least the law says biological sex. And I think we have to recognize on both sides the zero sum. It's not like, oh, just to add another person to the team. That's not how sports works. It's someone else is going to get disadvantaged. So I just want you to address that. I'm happy to, and I guess I have three answers. The first is I completely understand that many parts of sports are zero sum, but this law isn't limited to zero sum opportunities. So BPJ played on the cross-country team where there were no cuts. She came in near the back. I'm sorry to interrupt, but you wouldn't have a different rule if she was finishing in the top five. No, no, no, but it wasn't a zero sum. Or if they had cuts. But what I'm saying is there are. In this particular case, but usually with teams, I don't mean to just don't want to get out of that. Usually with teams, there are cuts. Those mean a lot to people. There's starting lineups. Those mean a lot to people. There's who gets a college recruit. That means a lot to people. Yes, yes, yes, I just want to say that there still are some areas where there are win-win solutions. I think even being able to be on practices with a team consistent with your gender identity instead of your sex assigned at birth can be enormously important. So I think some scenarios are zero sum, but not everything having to do with sports is. And I do think that one of the vices of this law is that it sweeps so broadly that even win-win solutions are taken off the table. In terms of aspects where it's zero sum, no one likes to lose. No one likes to not make the team. And people often don't make the team. Cisgender girls don't make the team when competing against other cisgender girls all the time. And the question, I think, is whether it's an unfair advantage to not make the team because a transgender girl participated. And if there is no sex-based biological distinction there, then I think it's an unfortunate situation, but I think it's the unfortunate situation that comes with having a zero sum game, not inherent unfairness. And the third thing is I think however the court resolves this case, I really urge the court not to do it based on a definition of sex argument. We are not disputing in this case that West Virginia can have its definition of sex. Our argument is it's using this definition to inflict discrimination and denial of equal athletic opportunity. But we are not saying their definition of sex is wrong. However, I don't think it follows that Title IX created some national definition of sex that preempted states' ability to say, you know, actually we are most concerned about discrimination that happens through gender roles. Can I ask you something? That's a very important point here, I think, for what happens in the future, what you just said. Do you think sex in Title IX can reasonably be interpreted to allow different states to take different understandings of that in their sports leagues? I do because I don't... Why is that? That's real important, I think, going forward. Because I don't think the purpose of Title IX is to have an accurate definition of sex. I think the purpose is to make sure that sex isn't being used to discriminate by denying opportunities. Just as I don't think we need to define race in order to enforce Title VI. So I think I wouldn't look to whether or not it's accurate to classify, you know, BPJ as male or female. I think the question is, is she being denied an opportunity because of that classification? But obviously sex can mean more than just... So if we didn't want to prevent a different state from making a different choice from West Virginia, what should we not say or what should we say to prevent that from happening? I wrote down the answer to that. When you asked Mr. Moopin, I had two things. I wrote, don't give definition of sex. And I also said I wouldn't decide this by assuming that Title IX provides a right to single-sex teams. In the regulations, single-sex teams are optional. They're not mandatory. And in addition to that, we're talking about the regulations. But on the ground, the way this plays out in practice is you have a 1979 policy statement, a sub-regulatory document that has a complicated test for determining when a sex-separated team is or is not required. And so I think that both because I think saying there's a right to a sex-separated team, like, would predetermine some of the questions in that other case. That's one reason why I don't think you should do that. But second, I think the more the court gets into questions that are handled in these complex regulatory documents, I think the more I'd be worried about this court accidentally saying something about how Title IX works that doesn't actually map on to how it is actually playing out on  Title IX prohibits discrimination on the basis of sex. It's a statutory term. It must mean something. You're arguing that here there's discrimination on the basis of sex. And how can we decide that question without knowing what sex means in Title IX? I mean, it could mean biological sex. It could mean gender identity. It could mean whatever a state wants to define it to mean. But it has to mean something. How can we decide that without knowing what the statutory term means? Well, I think there are a whole range of sex-based characteristics that can give rise to discrimination. I think if someone said, I'm going to discriminate against anyone who acts in a feminine manner, like, anyone with limp wrists, I don't care who they are, but I'm going to discriminate against them, like, I think that would be sex discrimination. It would be sort of gender presentation. But I wouldn't say that's not covered by Title IX. And so I just, I'm not saying that biological differences aren't part of sex, but I'm saying that sex also has broader connotations, and there's no reason to keep that out of the statute. And I'm certainly not saying that sex means gender identity. I just want to be very clear about that. I don't think that, you know, just as, I would say this. Our argument is that there's a group of people who are assigned male at birth who, for whom being placed on the boy's team is harmful. Right? We happen to have a word for those people. It is transgender girls. But I don't think that means that we're elevating gender identity to be the new definition of sex. Just as in Phillips versus Martin Marietta, there's a subset of women, you know, who are harmed by the policy. Not all women. There's a subset of women who had young children. And there's a name for them. It's mothers. But that doesn't mean that we're replacing the word sex with mothers. How do you respond to or deal with the other side's characterization of that harm as just the disparate impact of this regulation? That really, you know, it's not discrimination, I think they're saying, but it is just the downstream effect of the application of the classification that the JAPSA amendment allows. And that's just the way it goes. Yeah. So I guess I would say this. I think this court has dealt with the issue of things like constructive denials and constructive discharges in a variety of contexts. And under Title IX, an outright denial isn't required. David says a constructive denial also counts. And whenever there's a question of constructive denials, the court applies the standard that's reasonable person in the plaintiff's position under all the circumstances. And they use that for constructive denials. You've used that for retaliation claims. And if you look at Burlington v. White, I think it's very on point here. Because one of the points that Burlington v. White said is that there's some actions that aren't going to be harmful to most people, but they might be harmful to some people. So, again, Burlington v. White used a mother with young children might find a change in her work schedule to be incredibly harmful. Right? So that doesn't mean that, you know, we're arguing that, you know, this is a disparate impact classification on people who have young children. It's a sex classification. The sex classification is just harming some people and not harming other people. So that's how we would view it. I think this is a facial sex classification any way you cut it. Well, I'm sorry. You don't think we should have an operating definition of sex in Title IX? Now, I understand the idea that the question then becomes not whether or not there's discrimination on the basis of sex, but whether there's discrimination on the basis of whatever characteristic you think should be included in the definition of sex. Now, when it's used as a statutory term, I'm not sure you have that kind of flexibility. The question would be, instead, what does Congress think the word means? Well, Your Honor, I guess I'd say I think Congress prohibited discrimination based on sex. I'm sorry. Go ahead.  And so I don't think that just as I don't think Congress adopted a definition of race, you know, in Title VI in order to prohibit discrimination on the basis of race. I think we're not trying to police the accuracy of the terminology that's being used. All I'm saying is that what's being prohibited is using this classification to discriminate. Well, but without really knowing what the distinction is. Well, you know, I don't think the examples I've given about sex-based characteristics fall outside the common understanding of things that are related to sex. Well, related to sex. I guess what you're saying is we do have to accept for your position that we're not dealing when Congress says sex, we're not dealing with biological sex. But we're dealing with other characteristics that people might associate with sex? No, no, no. I think for this case, you can accept for the sake of this case that we're talking about what they've termed to be biological sex. I think that resolves this case. I was just talking about in addressing other potential cases. So we don't have to say anything about the matter. You're willing for us to proceed on that assumption. Exactly. Just like in Bostock, I think you can proceed for argument's sake without taking a definitive position here. Because it might have downstream consequences in other cases that even the United States doesn't want the court to prejudge here. Now, I would like to say one quick thing on Justice Barrett's reference to separate classrooms. I mean, it is true. And the ACLU's litigated cases about theories that there's different brain sexes for women versus boys. And that's why you need separate classrooms. I don't think, I think the instinct was completely correct that you can have a lot of scientific justifications for discrimination. That doesn't mean that the discrimination is allowed or immune from scrutiny. And, in fact, some of the studies that are cited in the amicus brief say boys are naturally more aggressive. Right? And favor competition more. Because that's in their DNA. So I do think even in these studies, the idea that you're completely, you know, just basing it on pure biology and not on other generalizations doesn't quite hold up. I'd also, to the extent that we want to go back to Caban, I do want to just make a couple of quick things clear. Caban was not a facial challenge. It wasn't. And neither was, some of the First Amendment cases they were talking about weren't equal protection First Amendment cases. They were commercial speech cases. Michael M. also wasn't a facial challenge. He wasn't saying I should have an exception because a prepubertal girl was involved. He was saying the statute is over broad because in theory it could apply to a prepubertal girl. So I do think that some of the characterization of the cases doesn't hold up to our reading of them. So how does a Caban type as applied intermediate scrutiny analysis work in your view? It is an underdeveloped area of the law. Is it enough for one person to show that she bucks the trend or not? I don't think so. I think I agree with my co-counsel that I think we're talking about a discrete, like definable group that will reliably not serve the government's interest. And I don't think Nguyen is a counterpoint to that because the whole point of this case is that there are three very easy methods of transmitting citizenship. And Nguyen emphasized that in order to do it, those were minimal burdens. And that is the key fact in Nguyen that distinguishes it from this case. This is a categorical ban. And Nguyen and Caban and all the court's cases distinguish between categorical bans and more narrow procedural requirements that do treat men and women differently but still provide the opportunity for demonstrating that you're not similarly situated. I think a hard question that Ms. Hartnett got may be the hardest question on these lines was if we recognize these sorts of as applied challenges, doesn't that effectively turn intermediate scrutiny into strict scrutiny? What would your answer be to that? Would it be any different or do you want to elaborate? I think the answer is it absolutely wouldn't. You still are only looking for a substantial relationship, which means that you can have these sorts of requirements. Where there are a lot of under Caban and under Lair, there's still a lot of fathers that are out of luck that they actually like probably do have a good relationship with their kid, but they didn't figure out, fill out the right paperwork. They didn't do this. They didn't do that. And high-end screening doesn't require that they be excused from those procedural burdens. So I do think that heightened scrutiny allows you to have procedural requirements that people have to go through, and those can be enforced. Strict scrutiny does not allow that. But that's different from saying that if the complete rationale for a classification just doesn't apply to you, that there's no equal protection claim you can bring. And some of the – it's complicated to talk about the difference between facial and as applied post-CASA, because I think a lot of the things that we call facial challenges now would be viewed as over breadth challenges, right? Where someone is trying to say the law is so over broad in general, it has to all be struck down. And we have that for First Amendment. I don't think we have that anymore for most equal protection claims. And so I think taking this facial as applied framework from before CASA, where we allowed these facial attacks on statutes, and then just transporting it into as applied cases post-CASA doesn't necessarily work. I think some of the terminology might need to be rethought. And so, again, that's another reason why there's not a lot of precedent in this area, as several of you all have acknowledged. And that's another reason why I don't think this should be the case that makes that precedent when it's unnecessary to do so. Thank you, counsel. Justice Thomas? Justice Alito? Justice Sotomayor? Would you address a little bit the quantum of certainty or uncertainty that would have to exist in the science? Your co-counsel, or the counsel in the other case, said that if it's 50 percent, the state loses. But I'm always hesitant about these percentage cases, because it's never quantitative, it's qualitative. So what do you think the qualitative standard is? Well, to be clear, I don't actually think there's uncertainty in the case of someone who's had puberty blockers and then gender-affirming hormones. Our position is there's zero uncertainty. It's actually clearly in our favor. But in general, I think it's hard to give a quantitative answer to that. I think part of heightened scrutiny involves taking all of these factors into account. This Court, you know, has said on several occasions that heightened scrutiny can accommodate deference. And I think – I honestly think it's a case-by-case decision that also looks at how harmful the classification is, how burdensome it is. I don't think it's just – I don't think you just look at the accuracy of the classification and add a number value for how certain we are that it's accurate. I think many other factors come into play. Justice Kagan? Yes. Justice Gorsuch? Yes, ma'am. Justice Jackson? Yes, ma'am. Thank you, counsel. To the bottom, Mr. Williams. I think you've now heard Respondent abandon the Fourth Circuit's logic on Title IX, and I think in many ways that makes this Court's task that much easier. Congress authorized regulations allowing sex-separate athletics. West Virginia's definition of sex tracks the ordinary meaning in 1972 and 1974 and the regulatory framework that Congress endorsed. I think, Mr. Chief Justice, your question really highlighted how BPJ's approach unmoors this – the statute and the regulation under Title IX from on the basis of sex. BPJ's test, in turn, begins to look more towards other characteristics that aren't on the basis of biological sex, and I think that's not consistent with what we see there. I also think the answer to Justice Barrett's question reflected how under BPJ's theory this really isn't about competitive advantage, that really what this does turn on is gender identity, because BPJ continues to maintain that a cisgender boy who continues to not have those same biological advantages would nevertheless still be kept off of the girl's sports team. So if you endorse that philosophy, that would require the Court to hold that longstanding Title IX athletic regulations are unlawful. It would eliminate sex-separated athletics entirely, and I think it would On the equal protection side of the house, the question is whether the classification is substantially related to an important governmental interest, and I think that BPJ ultimately wants to rewrite the classification to be something that it is not. Biological sex substantially relates to athletic performance. That's exactly why, in fact, Title IX regulations authorize sex-separated teams in the first place. Respondent's test effectively ratchets up the intermediate scrutiny standard into a perfect fit, best fit, best disposition case that this Court has repeatedly said is not the standard under intermediate scrutiny cases. That is the standard for strict scrutiny cases. You have heard it several times today. Justice Sotomayor, you asked about deference. I think this Court has also repeatedly recognized that in areas of evolving science and medicine, especially involving children, legislatures have the primary responsibility for weighing competing evidence and making the policy judgments. I think the Court just recently said that in Scrimetti, but I certainly don't think that case stands alone in recognizing that especially when you have competing balances of harms, Justice Kavanaugh, when you're weighing these sorts of zero-sum games, that's a choice that's a policy judgment that ultimately rests in the hands of the legislature. In the end, this Court has, quote, recognized physical differences between men and women. They are enduring. And inherent differences between men and women are cause for celebration. That is all that West Virginia's law does here. It should be upheld. Thank you. Thank you, counsel. The case is submitted.